**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **GUITAR HOLDING CO., L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-10-CV-214-KC** |
| | § | |
| **EL PASO NATURAL GAS CO.,** | § | |
| | § | |
| **Defendant**. | § | |

**<u>ORDER</u>**

On this day, the Court considered "Plaintiff's Motion to Remand" ("Motion") (Doc. No.

3).  For the reasons set forth below, the Motion is **DENIED**.

**I.    BACKGROUND**

Plaintiff Guitar Holding Co., L.P. ("Guitar") is a Texas limited partnership with its principal

place of business in Texas.  Pl.'s Original Pet. 1.[1]  Defendant El Paso Natural Gas Company

("EPNG") is a Delaware corporation.  *Id.*  Its principal place of business is disputed, though, and

this will be addressed more fully below.  In 1929, Guitar granted EPNG an easement across the

Guitar Ranch located in Hudspeth County, Texas, for the purposes of constructing underground

natural gas pipelines.  *Id. at* 2.  After seventy six years of operation, EPNG sought to abandon

two lines, numbers 1000 and 1001.  *Id.* at 2-3.  The Federal Energy Regulatory Commission

("FERC") approved of the abandonment of the pipelines.  *Id.*  Around October or November

---

[1]          Defendant filed its Notice of Removal with the Court (Doc.
No. 1) and included the Plaintiff's Original Petition in this
filing without marking it as a separate exhibit.  All references
to Plaintiff's Original Petition will use that document's internal
pagination.

2009, EPNG released the relevant pipeline sections to Guitar.  *Id.*  The proposed Release

Agreement[2] between EPNG and Guitar stated that if Guitar removed the pipelines, it could not

seek indemnification against EPNG and must hold EPNG free of liability for any harm arising

from such removal.  Release Agreement ¶ 4.

    The proposed Release Agreement from EPNG mentioned the presence of "unspecified

hazardous materials" on or around the pipelines.  *Id.* ¶ 3.  The agreement also mentioned that

"some or all of the hazardous materials may be hazardous to human health and/or the

environment."  *Id.*  Guitar claims this was its first notification during the entire easement lifetime

that the pipelines contained hazardous materials.  Pl.'s Original Pet. 3.  Guitar hired a pipeline

reclamation company to inspect the pipelines to determine both the identity of the suspect

materials and if the pipelines could be safely removed from the Ranch.  *Id.*  When examining the

pipelines specifically for potentially hazardous materials, the reclamation company's

environmental consultant was suspicious of the pipeline coating, and took surface and

underground soil samples which appeared to contain coating particles.  *Id.* at 3-4.  Testing

showed that the samples contained significant amounts of asbestos.  Test Results 2.[3]  Guitar

contends that these hazardous particles were spread by "stripping" the pipeline coating during

previous maintenance work done by EPNG.  Pl.'s Original Pet. 4.

---

[2]    There is no evidence that the Release Agreement was signed by both parties.  As such, it is referred to only as a "proposed" agreement.  It is marked as "exhibit 1" to Plaintiff's Original Petition and included in the Notice of Removal.  Due to the absence of pagination, references to this document will be to specific paragraphs located within.

[3]    The document containing the laboratory test results, "exhibit 2" to Plaintiff's Original Petition, has no caption.  For present purposes it will be styled "Test Results," and page number references are to that document's internal pagination.

Guitar brought suit against EPNG in the 394th District Court of Hudspeth County, Texas, on April 18, 2010, raising several causes of action:  1) common law fraud; 2) nuisance; 3) negligence; 4) gross negligence; and 5) strict liability.  *Id.* at 6-7.  Guitar is seeking actual and exemplary damages.  *Id.* at 8.  On June 9, 2010, EPNG timely removed this case to federal court, claiming diversity jurisdiction.  It claims that its principal place of business is not Houston, Texas, as alleged in the Original Petition, but rather Colorado Springs, Colorado.  Notice of Removal 1.  On June 15, 2010, Guitar timely moved to remand to state court arguing that diversity was lacking.  *See generally* Mot.  Guitar cites various publicly filed documents listing Houston as EPNG's principal office, and argued that Texas, not Colorado, is where EPNG's principal place of business is located.  Mot. 3.  Additionally, Guitar seeks to recover attorney's fees related to the preparation of the Motion.  *Id.*  On June 29, 2010, EPNG filed its Opposition to Guitar's Motion to Remand ("Response") (Doc. No. 4), and on July 7, 2010, Guitar filed its Reply (Doc. No. 5).

## II.    DISCUSSION

### A.    Standard

A defendant may remove an action from state court to federal court if the action is one over which the federal court possesses subject matter jurisdiction.  *See* 28 U.S.C. § 1441(a).  The removing party must show that federal jurisdiction exists and that removal is proper.  *See Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002).  In evaluating jurisdiction, "any ambiguities are construed against removal because the removal statute should be strictly construed in favor of remand."  *Id.*  The district court is required to remand a case to state court if, at any time before final judgment, it determines that it lacks subject matter

jurisdiction over the case.  28 U.S.C. § 1447(c).  Where the jurisdiction of the court is

challenged, the burden is on the party seeking to preserve the district court's removal jurisdiction.

*Frank v. Bear Stearns & Co.*, 128 F.3d 919, 921-22 (5th Cir. 1997)*; Sid Richardson Carbon &*

*Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 751 (5th Cir. 1996).

Federal diversity jurisdiction lies when the amount in controversy between parties

exceeds $75,000 and the parties are citizens of different states.  *See* 28 U.S.C. § 1332; *see also*

*Stiftung v. Plains Mktg., L.P.*, 603 F.3d 295, 297 (5th Cir. 2010).  To determine the citizenship of

a corporation, the federal diversity jurisdiction statute provides, in pertinent part, that "a

corporation shall be deemed to be a citizen of any State by which it has been incorporated and of

the State where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  When citizenship

is disputed, allegations of a party's citizenship are insufficient on their own to prove diversity;

evidence must be supplied by the party claiming diversity or else the district court may remand

for want of jurisdiction.  *See Roberts v. Lewis*, 144 U.S. 653, 658 (1892); *see also Welsh v. Am.*

*Surety Co.*, 186 F.2d 16, 17 (5th Cir. 1951).

The long-standing "total activities" test implemented by the Fifth Circuit to determine a

corporation's principal place of business required courts to consider two "focal points": the

location of the corporation's "nerve center" and its "place of activities."  *Teal Energy USA, Inc.*

*v. GT, Inc.*, 369 F.3d 873, 876 (5th Cir. 2004).  However, in an attempt to create uniformity, the

Supreme Court recently abrogated the various "principal place of business" tests used by the

various circuit courts.  *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192 (2010).  In place of these

tests, the Court stated that a corporation's principal place of business is located at its "nerve

center" – the place where a corporation's officers direct, control, and coordinate the corporation's

activities. *Id.*

### B.    Principal Place of Business

In February of this year, the Supreme Court set forth its own test to determine a

corporation's principal place of business, abrogating the various tests used by the circuits. *Hertz*,

130 S. Ct. at 1191. In formulating the new test, the Court adopted and expanded the reasoning

used by the Seventh Circuit to determine a corporation's principal place of business. *See Hertz*,

130 S. Ct. at 1191; *see also Wis. Knife Works Co. v. Nat'l Metal Crafters*, 781 F.2d. 1280, 1282

(7th Cir. 1986) (stating that a corporation's "nerve center" should be readily and easily

determinable rather than based on a vague standard of looking to all of a corporation's assets and

activities). Under the new test, the phrase "principal place of business" is best understood to

denote the place where a corporation's officers direct, control, and coordinate the corporation's

activities – *i.e.*, the corporation's nerve center. *Hertz*, 130 S. Ct. at 1192. A corporation's "nerve

center" should normally be the place where the corporation has established its headquarters,

provided that the headquarters is the actual center of direction, control, and coordination, and not

simply an office where the corporation holds its board meetings. *Id.*

The Supreme Court understood that this newly minted approach, although imperfect, is

"relatively easier to apply," requiring courts to look to a single location – toward the center of

direction, control, and coordination – instead of weighing different factors such as corporate

functions, assets, or revenues against each another. *Id.* at 1193-94. Pre-*Hertz* courts have

consistently looked to a number of key factors when determining the location of a corporation's

nerve center.[4]  Of these factors, some of the most common are:  1) location of corporate and

executive offices; 2) the site where day-to-day control is exercised, *Hines v. KFC U.S. Props.*,

No. 09-CV-2422, 2010 WL 596439, at *2 (S.D. Cal., Feb. 16, 2010); 3) the exclusivity of

decision making at the executive office and the amount of managerial authority at that location;

4) the location where corporate records and bank accounts are kept, *J.A. Olson Co.*, 818 F.2d at

413; 5) where the board of directors and stockholders meet; 6) where executives live, have their

offices, and spend their time; 7) the location where corporate income tax is filed; 8) the location

designated in the corporate charter, *Homestead Log Co. v. Square D Co.*, 555 F. Supp. 1056,

1057 (D. Idaho 1983) (internal citation omitted); and 9) the location where a) major policy, b)

advertising, c) distribution, d) accounts receivable departments and e) finance decisions

originate.  *Diaz-Rodriguez v. Pep Boys Corp.*, 410 F.3d 56, 63 (1st Cir. 2005).  The Court will

evaluate the evidence proffered by both parties in light of these various factors to fix the location

of a corporation's nerve center.

    **C.**    **Applying the New Test**

---

[4]    A  nerve center analysis of some kind has been previously used by a majority of the circuits to aid in their attempts to formulate a principal place of business test.  *See, e.g., Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 61 (1st Cir. 1993); *R. G. Barry Corp. v. Mushroom Makers, Inc.*, 612 F.2d 651, 655 (2d Cir. 1979); *Peterson v. Cooley*, 142 F.3d 181, 184 (4th Cir. 1998); *Teal Energy USA, Inc. v. GT, Inc.*, 369 F.3d 873, 876 (5th Cir. 2004); *Dimmit & Owens Fin., Inc. v. U.S.*, 782 F.2d 1186, 1191 (7th Cir. 1986); *Tosco Corp. v. Cmtys. for a Better Env't*, 236 F.3d 495, 500 (9th Cir. 2001); *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1239 (11th Cir. 2005); *Masterson-Cross v. Criss Bros. Iron Works, Inc.*, 722 F. Supp. 810, 812 (D.D.C. 1989).  The *Hertz* decision's determination that a corporation's nerve center is its center of overall control, direction, and coordination is largely similar to these previous nerve center definitions.  *See Hertz*, 130 S. Ct. at 1192.

EPNG, the removing party, has the burden of establishing the existence of federal

jurisdiction in this case.  *See Manguno*, 276 F.3d at 723.  To effectively meet this burden, EPNG

must support assertions about its citizenship with competent evidence.  *See Roberts*, 144 U.S. at

658.  EPNG contends that diversity jurisdiction is met because it is a Delaware corporation with

its principal place of business in Colorado, while Guitar is a citizen of Texas.  Def.'s Notice of

Removal ¶ 2.  To support this contention, EPNG has offered 286 pages of evidence comprised of

executive declarations and various corporate filings or documents which illustrate the facts

asserted in the declarations. *See generally* Def.'s Resp. Exs. A-G (Doc. Nos. 4-1, 4-2).  In order

to establish Colorado as its principal place of business, EPNG must demonstrate to this Court,

under the "nerve center" test, that its office in the Colorado Springs is the place where it directs,

controls, and coordinates its corporate activities.  *See Hertz*, 130 S. Ct. at 1192.  Accordingly,

this evidence will be examined in light of the factors discussed above.

In *Homestead Log*, the court indicated that where executives live, have their offices, and

spend their time are important factors in determining the location of a corporate nerve center.

*Homestead Log Co.*, 555 F. Supp. at 1057.  Seven of EPNG's high-ranking officers, including

the corporation's president James Cleary, and various vice presidents, live and work in Colorado

Springs.  Decl. of James J. Cleary ¶¶ 2, 10 ("Cleary Decl.") (Doc. 4-1 Ex. A).  Situating these top

executives in Colorado Springs demonstrates that EPNG has made its Colorado office the

location where the corporation receives its direction.

In *J.A. Olson Co.*, the court indicated that directors and executives at a corporation's

nerve center tend to have considerable managerial and exclusive decision-making authority.  818

F.2d at 413.  In the present case, the EPNG's Director of Regulatory Affairs, General Counsel,

and Director of Rates are located in Colorado and receive all notices, orders, and requests

directed from the FERC to EPNG.  Cleary Decl. ¶ 7.  As an interstate natural gas pipeline system,

EPNG operates under FERC guidelines and regulations, and must submit an annual FERC

Financial Report.  *Id.* ¶¶ 5-6.  In addition to the FERC Financial Report, EPNG is also required to

file a Gas Tariff with the FERC.  *Id.* ¶ 9.  In EPNG's dealings with the FERC, Colorado Springs

is specified as the location toward which any and all inquiries should be directed.  *Id.* ¶¶ 7-9.

The officers and directors at Colorado Springs are thus evidently given considerable decision

making and managerial authority in their direct dealings with the very body that governs EPNG,

which satisfies a nerve-center factor.  *See J.A. Olson Co.*, 818 F.2d at 413.

In *Hines*, the court determined that the location where day-to-day control over a

corporation is exercised is an important factor to consider in a nerve center analysis.  *See Hines*,

2010 WL 596439, at *2.  Additionally, the *Diaz-Rodriguez* court indicated that the location of

policy and distribution departments are important factors to consider when locating a

corporation's nerve center.  *See Diaz-Rodriguez*, 410 F.3d at 63.  In addition to the executives

that handle FERC related issues, other managers and directors plan and coordinate crucial day-to-

day activities for EPNG at their Colorado Springs location.  These activities include:  marketing

(developing new customer relationships in addition to maintaining old ones), business

development (planning and implementing new pipeline projects), nominations and scheduling

(managing customer orders, coordinating and scheduling delivery, and ensuring all customer

inquiries are addressed), gas control (coordinating the real-time flow of natural gas throughout

EPNG's system of pipelines and retains related records and data), volume management

(managing EPNG's volume accounting and FERC filings to ensure they are accessible to all

customers), facility planning (managing the design and development of EPNG's pipeline system), and rates and regulatory affairs (coordinating regulatory compliance).  *See* Cleary Decl. ¶¶ 11-12.  These various activities indicate that the Colorado Springs office is the location where EPNG houses major policy and distribution departments, and that these departments exercise considerable day-to-day operational control.  *See Diaz-Rodriguez*, 410 F.3d at 63; *see also Hines*, 2010 WL 596439, at *2.  Thus, EPNG has used declaratory and documentary evidence to show that numerous traditional "nerve center" factors weigh in favor of a conclusion that EPNG's principal place of business Colorado Springs.

Guitar counters by claiming that EPNG's principal place of business is in Texas and not in Colorado.  *See* Reply ¶ 5.  To support its contention, Guitar offers eight exhibits composed of Securities and Exchange Commission ("SEC") 10-K and 10-Q forms, business organizations inquiries from both the Texas and Colorado Secretary of State websites, state franchise tax filings, a Texas Franchise Tax Report (both the actual report and an attachment indicating the names of EPNG's officers and directors), and an annual report filed by EPNG with the Colorado Secretary of State, which all list a Houston, Texas, address for EPNG.  *See* Mot., Exs. 2-9.  This is indeed some evidence that EPNG's nerve center may be located in Texas.

Guitar argues further that, under Federal Rule of Evidence 801(d)(2), these various exhibits constitute admissions by a party opponent and alone are "dispositive evidence" and "admissions of fact" that Houston is the location of EPNG's "nerve center."  Pl.'s Reply ¶¶ 1-7. However, ordinary evidentiary admissions such as these are not conclusively binding; as statements, assertions or concessions made for some independent purpose they are admissible as evidence but may be controverted or explained by the party that made them.  *See In re Zonagen,*

*Inc. Sec. Litig.*, 322 F. Supp. 2d 764, 783 (S.D. Tex. 2003).  In contrast, judicial admissions are

formal concessions in the pleadings, or stipulations made in the case at hand, which *are* binding

on the party making them.  *See Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001).

As the filings cited by Guitar are not pleadings from the instant case, but declarations made at

other times and for other purposes, they are admissible as evidence but are amenable to rebuttal.

And, as noted above, EPNG has gone to some lengths to bring other evidence to rebut the

principal place of business inferences that Guitar draws from these documents.  Additionally, the

Supreme Court has explicitly held that corporate form filings indicating a corporation's principle

office, without further explanation, are not dispositive regarding a corporation's nerve center.

*See Hertz*, 130 S. Ct. at 1195 (explaining that a corporation's SEC 10-K form listing the location

of a corporation's "principal executive office" by itself is not dispositive of the location of that

corporation's "nerve center").

The court in *Homestead Log* indicated that the location from which tax returns are filed is

a factor to consider in a nerve center analysis.  *Homestead Log Co.*, 555 F. Supp. 1056.  Guitar

stresses the fact that EPNG's tax returns list a Houston address.  *See* Reply ¶ 8.  The importance

of this factor in the instant case is diminished, however, by the fact that EPNG is a wholly-owned

subsidiary of the El Paso Corporation, and so files its tax returns on a centralized, consolidated

basis along with its corporate parent and sibling subsidiary companies.[5]  *See* Decl. of Robert

Skinner ¶¶ 1-4 ("Skinner Decl.") (Doc. 4-2 Ex. G).  It is well established that, unless it is not a

separate entity from its corporate parent, a subsidiary has its own principal place of business for

diversity jurisdiction purposes.  *See Burnside v. Sanders Assocs., Inc.*, 507 F. Supp. 165, 166-67

---

[5]     The parent corporation's headquarters indeed appear to be in
        Houston, Texas.

(N.D. Tex. 1980), *aff'd*, 643 F.2d 389 (5th Cir. 1981).  It is entirely plausible for EPNG to file

tax returns that specify a Houston address – reflecting the consolidation of tax functions at the

level of the corporate parent – while, on balance, having its own nerve center located elsewhere.

Thus, the tax returns and SEC filings, in particular, do not add significant weight towards finding

that EPNG's nerve center is located in Houston.

## III.     CONCLUSION

Given the large number of indicia of a Colorado "nerve center" shown by EPNG, relative

to the small number of countervailing factors shown by Guitar, the Court concludes that EPNG

has carried its burden of demonstrating diversity of citizenship.  Guitar has noted its inability to

conduct adequate discovery and cross-examination at this early stage in the proceedings, which

would allow it to obtain further evidence regarding EPNG's principal place of business.  *See*

Reply ¶ 5.  As serious as such concerns may be, however, the Court must decide the instant

Motion on the evidence before it, which best supports the conclusion that Colorado is EPNG's

principal place of business.  Accordingly, Guitar's Motion to Remand (Doc. No. 3) is hereby

**DENIED.**

**SO ORDERED.**

**SIGNED** on this 18th  day of August, 2010.


_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE